The NAVAJO NATION, Plaintiff,

v.

The UNITED STATES of America, Defendant.

No. 93–763L.

United States Court of Federal Claims.

Dec. 20, 2005.

Paul E. Frye, Albuquerque, NM, for plaintiff.

Devon M. McCune, Washington, D.C., with whom were Todd S. Aagaard, Kristine S. Tardiff, for defendant. Stephen L. Simpson, Washington, D.C., of counsel.

John Bergen, Law clerk.

## OPINION

BASKIR, Judge.

This case has been presented to us on remand from the U.S. Court of Appeals for the Federal Circuit. In brief, the Plaintiff's Complaint charges a trust or contract violation in the Secretary of the Interior's approval of coal lease amendments viewed as detrimental to the Navajo Nation, primarily in the establishment of a royalty rate of 12.5 and not 20 percent of the lessee's gross revenues. The Navajo Nation claims damages in the amount of $600 million have resulted from the Government's breach. We refer the reader to the very detailed summary of the Plaintiff's claims as set forth in our initial Opinion. *See Navajo Nation v. United States,* 46 Fed.Cl. 217 (2000) (*Navajo I*).

In that Opinion, we ruled in favor of the Government on cross-motions for summary judgment and dismissed the Navajo Nation's Complaint on what amounted to jurisdictional grounds. The Plaintiff argued then, as it does now, that jurisdiction is established by virtue of the trust relationship that exists between the United States and the Navajo Nation. In this Opinion, we respond to questions addressed to us by the Court of Appeals on remand. First, however, we must relate the procedural history of the case in order to put the remand in its proper context.

### *PROCEDURAL BACKGROUND*

The question presented initially during summary judgment proceedings and now on remand rests entirely on the legal interpretation of the treaties, statutes and regulations that form the basis for the trust duties allegedly breached.

Jurisdiction in Indian trust cases is determined by the level of governmental control and supervision of the trust property involved—in this case, royalties from coal leases. Presented with the task of determining where the Plaintiff's claims fit within a spectrum of Indian trust cases, we found "that the Secretary's role in the Navajo's coal leasing—that is, his control *or* supervision of coal leasing—falls far short of the detailed fiduciary responsibilities of *Mitchell II, Pawnee,* and *Brown,* on the one hand, and is more akin to the general fiduciary responsibilities addressed in *Mitchell I* and *Wright,* on the other." *Navajo I,* 46 Fed.Cl. at 234–35.

The Plaintiff successfully appealed to the U.S. Court of Appeals for the Federal Circuit. On August 10, 2001, a divided panel of the Court of Appeals arrived at the opposite conclusion, finding that the primary statute relied upon by the Navajo Nation—the Indian Mineral Leasing Act of 1938, 52 Stat. 347 (1938), 25 U.S.C. §§ 396a–396g—and its implementing regulations demonstrated pervasive control by the United States over Indian mineral leasing activities. *Navajo Nation v. United States,* 263 F.3d 1325, 1331 (Fed.Cir. 2001) (*Navajo III*). *But see, id.* at 1333 (concurring in part and dissenting in part, Schall, C.J.). The majority concluded:

> The United States breached its fiduciary obligations to the Navajo Nation in connection with these coal leases with Peabody. A claim for damages for that breach is within the jurisdiction of the Court of Federal Claims. The dismissal is reversed, and the case is remanded for further proceedings including determination of damages.

*Navajo III,* 263 F.3d at 1333. The Court's judgment so stated. Subsequent attempts by the Government to gain rehearing and reconsideration *en banc* were denied on November 16, 2001. On November 23, 2001, the Court issued its mandate formally reversing our judgment and remanding the case.

However, the Defendant successfully petitioned for certiorari, *United States v. Navajo Nation,* 535 U.S. 1111, 122 S.Ct. 2326, 153 L.Ed.2d 158 (2002), and the case was argued before the Supreme Court on December 2, 2002. Relying upon the same rationale initially advanced by this Court, the Supreme

Court concluded that the "controversy here falls within *Mitchell I's* domain." *United States v. Navajo Nation,* 537 U.S. 488, 493, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003) (*Navajo IV*). The majority opinion closed with the following:

> However one might appraise the Secretary's intervention in this case, we have no warrant from any relevant statute or regulation to conclude that his conduct implicated a duty enforceable in an action for damages under the Indian Tucker Act. The judgment of the United States Court of Appeals for the Federal Circuit is accordingly reversed, and the case is remanded for further proceedings consistent with this opinion.

*Id.* at 514, 123 S.Ct. 1079. The Supreme Court's mandate thus vacated the Federal Circuit's order, effectively reinstating the judgment of the Court of Federal Claims.

Upon remand to the Circuit Court, the case's appellate posture was back to "square one"—the Plaintiff's unresolved appeal of an adverse trial court judgment dismissing the Complaint for lack of subject matter jurisdiction. Upon consideration of the Supreme Court's decision, the Court of Appeals ordered that:

> (1) The mandate is recalled and the appeal is reinstated.
>
> (2) The case shall be returned for consideration to the original merits panel.

Order (Oct. 24, 2003). At this point, however, the panel declined to act on the merits of the Navajo appeal. The original appellate panel, again divided but along different lines, reasoned that the Supreme Court's decision "in this case was limited to the question of whether [the Indian Mineral Leasing Act of 1938, (IMLA) 52 Stat. 347, 25 U.S.C. § 396a *et seq.*] imposes judicially enforceable duties upon the United States in connection with the Peabody lease." *Navajo Nation v. United States,* 347 F.3d 1327, 1332 (Fed.Cir.2003) (*Navajo V*). The panel further observed of the Supreme Court's disposition:

> [I]n deciding that issue, the Court stated that 25 U.S.C. § 399 does not govern the lease and that the lease "falls outside IMDA's [the Indian Mineral Development

Act of 1982, 25 U.S.C. § 2101 *et seq.*] domain."

> The Court did not decide whether, apart from IMLA, section 399, and IMDA, "a network of other statutes and regulations" imposes judicially enforceable duties upon the United States in connection with the lease.

*Id.* The Court, however, did not immediately address the merits of that position. Instead the Federal Circuit sought further consideration of the question of jurisdiction. On March 16, 2004, the divided panel's remand order to us was issued as a mandate with the following direction:

- In the first instance, the Court should determine whether, as the Government asserts, the Tribe waived a claim with respect to "a network of other statutes and regulations."

- If the Court determines that such a claim was not waived, it should decide whether, apart from IMLA, section 399, and IMDA, a 'network of other statutes and regulations' imposes 'judicially enforceable fiduciary duties upon the United States' in connection with the Peabody lease and, if so, whether such duties were breached.

*Id.* But see, *id.* at 1332–35 (Newman, C.J. dissenting in part, on the basis that IMLA and IMDA should not be excluded from consideration upon remand). We note that the Court of Appeals in its remand to us did not vacate or reverse this Court's judgment, now restored by virtue of the Supreme Court's decision.

## DISCUSSION

### I. *Waiver:*

Pursuant to the remand, our first order of business is to consider whether the Plaintiff's "network" theory survives the waiver doctrine. *Navajo V,* 263 F.3d at 1332. Generally, a federal appellate court does not consider an issue not passed upon below. *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). The waiver doctrine is intended to prevent unfair surprise and corresponding prejudice to the opposing party. *See id.* (doctrine is "essential in order that

parties may have the opportunity to offer all the evidence they believe relevant to the issues ... [and] in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.") (quoting *Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941)).

There is no hard and fast rule on waiver. As the Supreme Court has directed, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Id.* Here the Federal Circuit has seemingly delegated that function to us. As an initial matter, we note that typical concerns in waiver cases are allayed in this instance. First, as we describe below, the "network" argument, if not the specific components of this network, was considered and rejected by this Court. *See e.g., Trierweiler v. Croxton and Trench Holding Corp.,* 90 F.3d 1523, 1538 (10th Cir.1996) (distinguishing *Singleton* on the basis that the district court implicitly addressed the issue, the appellant explicitly challenged the court's determination in his appellate brief and the appellees declined the opportunity to respond). Secondly, the Tribe's "argument concerns a purely legal question," thus "mitigat[ing] the force of the considerations underlying the policy of refusing to consider issues not raised below." *Id.* (citing *Stahmann Farms, Inc. v. United States,* 624 F.2d 958, 961 (10th Cir.1980)).

Preservation of issues for appeal "does not demand the incantation of particular words; rather, it requires that the lower court be fairly put on notice as to the substance of the issue." *Consolidation Coal Co. et al. v. United States,* 351 F.3d 1374, 1378 (Fed.Cir.2003). The Plaintiff has always asserted that a jurisdictional trust was created by the so-called "network," what it sometimes described as the "comprehensive statutory and regulatory scheme." In the allegations within the Complaint, the Navajo Nation described the network:

> The leasing of coal of the Navajo Nation is subject to a comprehensive statutory and regulatory scheme of the United States, executed by the agencies of the United States including the Bureau of Indian Affairs, the Office of Surface Mining Reclamation and Enforcement, the Bureau of Land Management, the Minerals Management Service and other agencies.

Complaint at ¶ 20. This paragraph of the Complaint goes on to cite not only IMLA and IMDA, but also the Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701–1757 (FOGRMA), as well as regulations promulgated under the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 *et seq.,* (SMCRA)—each components of the network theory asserted on remand. *Id.* Also invoked by the Tribe's pleadings is the Navajo and Hopi Rehabilitation Act of 1950, 25 U.S.C. §§ 631–38, another key authority in its remand brief. *See* Complaint at ¶ 21 ("The United States has adopted specific policies under the Navajo and Hopi Rehabilitation Act of 1950 to promote interests of the Navajo Nation.")

In the network proposed in its remand briefs, Plaintiff includes the following: 25 U.S.C. § 2 and 25 U.S.C. § 177; two treaties between the United States and the Navajo Tribe of Indians, 9 Stat. 974 (1849) and 15 Stat. 667 (1868); the Navajo and Hopi Rehabilitation Act of 1950, 25 U.S.C. §§ 631–38; SMCRA, in particular, the Indian Lands section, 30 U.S.C. § 1300, and the implementing regulations, 25 C.F.R. Parts 200, 216, subpart B, and 30 C.F.R. Parts 750 and 955; FOGRMA and implementing regulations applying its oil and gas provisions to Indian coal, 30 C.F.R. § 206.450 and 30 C.F.R. § 211.4; the Indian Right–of–Way Statute, 25 U.S.C. §§ 323–328, and implementing regulations found at 25 C.F.R. Part 169; and, contrary to the express terms of the mandate, IMLA, and the regulations implementing it, 25 C.F.R. Parts 211 and 216 subpart A and 43 C.F.R. Part 3480. Indeed, with minor exceptions the legal instruments cited by the Navajo Nation have always consisted of the same references.

The initial briefs filed by the Navajo Nation included an Appendix with the sub-caption "Constitutional Provisions, Treaties, Statutes and Regulations; Exhibits 1–128." This particular volume of Plaintiff's Appendix

(there were two volumes) includes 97 pages of statutes, regulations, treaties, executive orders and internal policies. All but one of the authorities cited now on remand—25 U.S.C. § 2—were previously cited by the Navajo Nation.

For the most part, these statutes and regulations were not discussed in the parties' briefs, however. Where they were cited it was often to demonstrate the general trust relationship that existed with respect to Indian tribal resources and the Federal Government. *See e.g.*, Pl. Mot. for Summary Judgment on the Issue of Liability on its First Claim for Relief (Dec. 15, 1997) ("Pl. Mot. for Summary Judgment") at 33 (Citing the Navajo and Hopi Rehabilitation Act, Plaintiff argued "Congress passed special legislation designed to combat the poverty and demoralization of the Navajo Tribe, to create a self-supporting Navajo economy, and to allow Navajos to attain a decent standard of living.").

The regulatory provisions relied upon by the Plaintiff were likewise not given extended treatment in earlier attempts to establish a compensable trust. Yet the "network" theme was always present even in its supporting role vis á vis IMLA, as the following excerpts from Plaintiff's briefs demonstrate. In its initial brief, the Plaintiff stated:

> DOI has promulgated comprehensive regulations governing every aspect of mineral leasing and production on reservation land (citation omitted). These regulations assign the responsibilities for carrying out the Government's comprehensive authority over the Indian mineral leasing to BIA and several other DOI agencies. *See* 25 C.F.R. Part 211 (1985) (prospecting, leasing procedures, substantive lease terms and conditions, payments of rents and royalties, and regulation of operations); 25 C.F.R. Part 216 (1985) (surface coal mining exploration, mining plans, operations and reclamation of Indian lands); 25 C.F.R. Part 169 (1985) (governing rights-of-way); 25 C.F.R. Part 200 (1993) (incorporation into Indian coal leases of terms and conditions regarding reclamation).

Pl. Br. in Support of Summary Judgement (Dec. 15, 1997) at 33–34. In its opposition to the Government's cross-motion, Plaintiff argued:

> This Court has jurisdiction over the Navajo Nation's claims here. In the 1849 Treaty with the Navajo, the United States promised always to "act ... to secure the permanent prosperity and happiness of [the Navajo people]." In the 1849 Treaty, the 1938 Indian Mineral Leasing Act, and relevant DOI regulations, the United States undertook the "exclusive right of regulating trade and intercourse" with the Navajo, and developed a comprehensive federal scheme that controls every aspect of the management of Navajo coal resources. "These regulations detail in exhausting thoroughness the government's management and regulatory responsibilities." Under that comprehensive scheme, the Department in 1964 approved the 8580 Lease, which granted exclusive authority to the Secretary of the Interior to adjust the royalty rate to a reasonable level after 20 years.

Navajo Nation's Consolidated Response to Def. Cross–Motion for Summary Judgment on Liability Issues and Reply in Support of Pl. Motion for Summary Judgment on the Issue of Liability on Its First Claim for Relief (Jun. 17, 1998) at 12–13 (internal citations omitted).

Despite its relatively brief treatment by the Plaintiff in these early papers, Plaintiff did not abandon its network argument. Indeed, in its motion for reconsideration, the Navajo Nation repeatedly argued that this Court had ignored this theory and had made an arbitrary distinction between regulation of coal royalties, on the one hand, and oil and gas royalties, on the other. *See e.g.* Mot. to Alter or Amend Judgment (Feb. 18, 2000) at 16–18 (reinforcing contention that "regulations governing the development, operation, and reclamation of coal mines on Indian lands are far more comprehensive than the relevant regulations governing oil and gas exploration and production.") Plaintiff referenced statutes such as the Federal Surface Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq., and the SMCRA, among others. *Id.* at 16. Moreover, in its Rule 59 motion the Tribe provided a list of

the "numerous federal agencies that supervise the various aspects of coal mining on Indian lands." *See id.* at 18.

The Court disagreed that it had ignored this argument:

> The primary thrust of the Navajo Nation's motion is aimed at the Court's observations regarding the lesser degree of federal regulation or control over coal-leasing royalties in this case as compared to the regulation of other Indian resources in cases where the Court's jurisdiction was successfully invoked. Essentially, the plaintiff quarrels with the manner in which we analyzed those cases. We are familiar with plaintiff's arguments in this respect—we considered them when the Navajo Nation challenged defendant's position on the same issues.

> The Navajo Nation alleges that the government conceded the basis for liability—comprehensive regulation of coal royalties—and "had no notice that a contrary view would form the basis of the Court's judgment." Mem. In Support of Mot. to Alter or Amend Judgment at 22, n. 11. The United States provides copious citations to its briefs to rebut this assertion. The Navajo Nation had ample opportunity to persuade the Court that the jurisdictional prerequisites were met. It was unsuccessful.

Order (Apr. 10, 2000) (*Navajo II*) at 3.

As the Plaintiff has demonstrated, the Navajo Nation asserted the comprehensive scheme, at least with the inclusion of IMLA, to both the Federal Circuit on the initial stage of appeal and to the Supreme Court, but each Court addressed only IMLA. *See* Pl. Suggestion for Proceedings on Remand (Apr. 7, 2003) at 6 (citing Brief for Appellant at 36–44 and Brief on the Merits for Respondent, Navajo Nation at 25–29).

With the failure of its primary theory based on IMLA, the Navajo Nation has greatly elaborated on its treatment of the once secondary network argument. In its submission to the Court of Appeals after the remand from the Supreme Court, the Plaintiff devotes renewed focus to this claim, "although the Navajo Nation pled and preserved [it] at every stage in these proceedings." Pl. Suggestion for Proceedings on Remand (Apr. 7, 2003) at 4. And in its subsequent submission to this Court, the elaboration of the network jurisdiction theory occupies nearly 30 pages. *See* Brief of the Navajo Nation on Remand From the Federal Circuit (Aug. 24, 2004) at 15–45. In fact, the discussion of the Navajo and Hopi Rehabilitation Act, alone, occupied 10 pages of the main brief, whereas the Plaintiff had offered but one citation to this particular statute during the original summary judgment briefing. *Compare id.,* at 18–23, 27–28, and 40–44, *with* Pl. Mot. for Summ. Judgment (Dec. 15, 1997) at 33; *see also* Reply Br. of Navajo Nation on Remand (Apr. 25, 2005) at 19–27.

In its earlier expositions, the network theme had IMLA as its centerpiece. IMLA and its regulations are cited throughout the summary judgment brief while other statutory and regulatory authorities Plaintiff emphasizes here were relegated to a string citation. *See* Pl. Mot. for Summ. Judgment at 34 (citing 25 C.F.R. Part 211 (1985), 25 C.F.R. Part 216 (1985), 25 C.F.R. Part 200 (1993), and 25 C.F.R. Part 169 (1985)—regulations promulgated under IMLA, SMCRA and the Indian Rights–of–Way Statute). There was, of course, no reason why the Plaintiff should advocate this theory without reference to IMLA. However, after the Federal Circuit panel majority took IMLA "off the table," Plaintiff was for the first time obligated to present its network theory without reference to that statute. (Strictly speaking, § 399 and IMDA join IMLA in removal by the panel majority from further consideration.)

We may conclude from this review that Plaintiff's advocacy on behalf of jurisdiction always included the network argument, albeit in a secondary role; that it always featured IMLA in a central position; and that Plaintiff's network argument *absent IMLA* has yet to be presented even after the Court of Appeals for the Federal Circuit directed Plaintiff to do so.

In any event, we do not view this issue as one that could be waived by the parties, insofar as it affects our jurisdiction under the Indian Tucker Act. Had we never been pre-

sented with the argument that there is a comprehensive scheme of governmental control over Indian coal-leasing—had we never been advised by Plaintiff of the existence of "a network of other statutes and regulations" purportedly establishing that control—an appellate court in its discretion would still properly consider the issue *sua sponte*. *See Consolidated Coal Co. v. United States*, 351 F.3d 1374, 1378 (Fed.Cir.2003) ("[U]nder federal rules any court at any stage in the proceedings may address jurisdictional issues") (citing *Broughton Lumber Co. v. Yeutter*, 939 F.2d 1547, 1555 (Fed.Cir.1991)).

## II. *Reassessment of the Network Argument:*

In its second remand instruction, the Court of Appeals for the Federal Circuit directs us to consider the jurisdictional sufficiency of the network argument *without reference* to IMLA, 25 U.S.C. § 399 and IMDA, all of which have been rejected by the Supreme Court. *Navajo IV*, 537 U.S. at 509–11, 123 S.Ct. 1079. We confess to some procedural uncertainty as to the mechanism for this reassessment since the Circuit has not vacated our original judgment. As a rule, proceedings on remand "should be in accordance with both the mandate of the appellate court and the result contemplated in the appellate opinion." 5 Am.Jur.2d § 782 (West 2005). Furthermore, the *trial court* must implement "both the letter and the spirit of the mandate ... taking into account the appellate court's opinion, and the circumstances it embraces." *Id.* We attempt here to comply with both the letter and the spirit of the Court's mandate.

Accordingly, we find no reason to revise our previous rejection of this argument as we expressed on two occasions, the original ruling (*Navajo I*) and the ruling on reconsideration (*Navajo II*). Our conclusions were based on our understanding of the precepts of *Mitchell II*. That is, to be judicially enforceable, the trust obligation must be directly related to the alleged breach. In other words, since the Plaintiff's claim involved the setting of royalty rates, the jurisdictional trust must encompass royalty setting. It is not sufficient that the asserted Government control extend to the implementation of coal leases or even to the collection of royalties. Thus, Plaintiff's recent extended treatment of the constituent elements of the "network" all concern implementation of coal leasing; they do not address the formation of coal leases, much less the establishment of royalty rates. With or without IMLA, the Plaintiff's current approach has the same deficiency. And we persist in our conclusion that it is unavailing as a basis for establishing jurisdiction.

Plaintiff has criticized this approach—first argued by the Government and adopted by the Supreme Court, *see e.g.*, 537 U.S. at 510–12, 123 S.Ct. 1079—as "myopic" and contrary to *Mitchell II*. Pl. Opp. at 22. Myopic or not, we found the Government's argument compelling as applied to the entirety of the regulatory scheme, including IMLA. It is even more definitive *without* IMLA. Although in its most recent brief to us, the Plaintiff devotes 30 pages to an exposition of its network theory, Plaintiff's argument on remand still fails to tie specific laws or regulatory provisions to the issue at hand—the Interior Secretary's approval of the royalty rate for the Navajo's coal. We examine the Navajo's exposition in some detail.

Plaintiff first cites 25 U.S.C. § 177 (1790) and 25 U.S.C. § 2 (1832). These two statutes represent Congress' earliest interventions concerning Indian affairs. The 1832 statute merely establishes within the Interior Department the Bureau of Indian Affairs, and charges the Commissioner of the Bureau with the responsibility to manage all Indian affairs and matters arising out of Indian relations. The 1790 statute, on the other hand, merely provides for the generally accepted principle that the Government may control the sale or lease of tribal property. Each of these laws is consistent with the undisputed general trust relationship between the Government and the Navajo; Plaintiff has cited no case law applying the statutes specifically in the context of a trust duty related to approval of coal leases.

Plaintiff also cites the 1849 and 1868 treaties upon which it has relied from the inception of this case. As we have previously recognized, the origins of the trust relation-

ship between the United States and the Navajo Nation, including the Government's "responsibility to regulate trade and intercourse with the Navajo and to secure their permanent prosperity and happiness," can be traced to these treaties. *Navajo I*, 46 Fed. Cl. at 221; *see also,* 9 Stat. 974 and 15 Stat. 667. The principles of these treaties are echoed again and again in the policies and procedures established by the United States in governing such Indian affairs as the protection and promotion of their resources. *Navajo I*, 46 Fed.Cl. at 221, 225–26. But that gets us only so far. As we have found with IMLA, a statute or regulatory provision must do more than provide in general terms for the Secretary to maximize revenues. As before, we believe the statute or regulation must "impose specific duties regarding the Secretary's adjustment of royalty rates for coal." *Navajo I*, 46 Fed.Cl. at 233.

Not unexpectedly, however, the Navajo Nation does not provide statutes and regulations that impose specific duties in this area. Instead, it cites the Indian Rights–of–Way Statute, 25 U.S.C. §§ 323–328, and its implementing regulations found at 25 C.F.R. 169, in order to demonstrate the supervision and control element of *Mitchell II*. The statute and its regulations were described by the Supreme Court in the *Mitchell II* case as follows:

> The Secretary is empowered to grant rights-of-way for all purposes across trust land, 25 U.S.C. § 323, provided he obtains the consent of the tribal or individual Indian landowner, § 324, and that the Indian owners are paid appropriate compensation, § 325. Regulations detail the scope of federal supervision. 25 C.F.R. Part 169 (1983). For example, an applicant for a right-of-way must deposit with the Secretary an amount not less than the fair market value of the rights granted, plus an amount to cover potential damages associated with activity on the right-of-way. The Secretary must determine the adequacy of the compensation, and the amounts deposited must be held in a special account for the distribution to Indian landowners. *See* 25 C.F.R. §§ 169.12, 169.14 (1983).

*Mitchell II*, 463 U.S. at 223, 103 S.Ct. 2961.

There is no doubt that this statute demonstrates Government control over access to Indian lands, generally. However, we fail to see the necessary implications of the law for royalties under a mineral leasing scheme which has its goal increased tribal authority in determining royalty rates. Plaintiff's position is expressed with the following *non sequitur:* "The Government's exclusive authority to grant rights-of-way on Navajo land enhances Federal control over the Navajo coal resources at issue here, and has reinforced the Government's acknowledged responsibility to provide fair coal royalties to the Navajo Nation." Pl. Remand Br. at 16. There is no question that the United States exerts substantial control in Indian affairs, in general, and also in certain aspects of coal mining operations as well as coal lease administration. But this statute provides no further evidence that the Government has assumed control over the adjustment of royalty rates prescribed by the leases.

Plaintiff invokes another statute it previously relied upon primarily for background purposes, *see* Pl. Remand Br. at 33—the Navajo and Hopi Rehabilitation Act of 1950, 25 U.S.C. §§ 631–640. The statute is argued with renewed vigor now. It does not explicitly govern mineral leasing, however. Plaintiff maintains that IMLA and the Rehabilitation Act must be applied and construed as a "harmonious whole." Pl. Remand Br. at 20–21. According to the Plaintiff, "[t]he meaning of IMLA must be shaped and focused by the more specific policies and provisions of the Rehabilitation Act, and these policies must control the construction of IMLA even though IMLA was not expressly amended." Pl. Remand Br. at 21.

The broader purpose of the statute was to promote a self-supporting economy and self-reliant communities among the Navajo and Hopi tribes. The law was passed as a response to conditions such as poverty, illiteracy, and poor public health services within these two tribes. We understand that coal-leasing was one means of attaining the goals of rehabilitation. *See* Declaration of Stewart L. Udall, former Secretary of Interior ("Coal leasing and related development was the centerpiece of the resources development pro-

gram under the Navajo and Hopi Rehabilitation Act of 1950."), Pl. Remand Br. at A1. Yet this part of Plaintiff's network does nothing to change our views on the nature of the trust duties respecting the administration of coal leases. The Rehabilitation Act is consistent with the basic principles of IMLA, and with the general trust relationship that has been recognized throughout these proceedings; the statute adds no more substance to the Secretary's duties respecting royalties.

The Surface Mining Control and Reclamation Act, 30 U.S.C. § 1300 (and implementing regs 25 C.F.R. 216, subpart B, and 30 C.F.R. pts. 750 and 955) is, according to Plaintiff's counsel "a statute that we've relied on in the past throughout these proceedings." Status Conf., Tr. at 13. Although relied upon in the initial proceedings, this statute was never given more than cursory treatment. It was cited to support the generally agreed upon thesis that the Federal Government exerts substantial control over coal mining operations. In the original briefing, the SMCRA regulations were included among the other regulatory provisions of Plaintiff's network in a string cite within a footnote. Pl. Summ. Judgment Br. at 34 n. 3. Indeed, we acknowledged that "the regulations and statutory provisions cited by the Navajo cover a range of issues from mining operations to rights-of-way, but touch only summarily on the topic of royalties." *Navajo I*, 46 Fed.Cl. at 232.

In contrast to its original briefing, here on remand, the Navajo Nation relies on this authority as an integral part of its network. *See e.g.*, Pl. Remand Br. at 23 (SMCRA "establishes yet more federal control over all surface coal mining activities on Indian lands, and it confirms Secretarial control and duties regarding the terms of Indian coal leases and lease amendments."); *see also*, Pl. Remand Br. at 15, 23–25, 31–32, 39–40, 42–43. It develops the statute—primarily an environmental statute—by analogizing it to the sustained yield statute in *Mitchell II*. Plaintiff maintains SMCRA "reinforces the Secretary's control of lease terms and independently establishes a duty of loyalty in including lease terms desired by Indian tribes." Pl. Remand Br. at 17. Of course, as with

many of the Plaintiff's assertions, there is no explanation of how the statute does this.

In a subsequent portion of the brief, Plaintiff addresses regulations promulgated under the Indian Lands section of SMCRA. *See generally*, Pl. Remand Br. at 23–26. The brief describes how the regulatory scheme reflects a conscious decision by Congress on several occasions (3 sets of regulations—1969, 1977 and 1984), to retain authority over surface mining activities in the Interior Department's Bureau of Indian Affairs. *See* Pl. Remand Br. at 24 ("These regulations deny the Secretary authority to delegate to tribes duties regarding the regulation of surface coal mining operations, stating that '[t]he Federal–Indian Trust responsibilities for land use decisions and other matters relating to surface coal mining and reclamation operations on Indian lands remain with the BIA.' ")(quoting 49 Fed.Reg. 38,469 (1984)).

However, the Navajo's argument still suffers from the same infirmities that led to our original conclusion. It does not demonstrate how royalty rates are subject to the Secretary's control. Instead, Plaintiff cites the litany of areas that are covered in the 1977 regulations—an admittedly comprehensive list of regulated activities such as signage and markers, post-mining use of land, backfilling and grading, disposal of soil and waste materials, preservation of topsoil, protection of hydrolic systems, dams and impoundments, and revegetation. Pl. Remand Br. at 24. Then Plaintiff traces how the 1984 regulations set up the Office of Surface Mining Reclamation and Enforcement as the "regulatory authority on Indian lands." As Plaintiff details in its brief, these provisions give the OSMRE extensive powers over permitting, inspections, and ensuring compliance with environmental laws. Pl. Remand Br. at 25.

Obviously, Plaintiff can demonstrate comprehensive management as well as Federal supervision and control—but this is no different than the list of items cited in the original IMLA argument. The simple fact of the matter is that there is necessarily substantial control in these areas—the strict regulation is justified by labor issues, occupational safety, and environmental conservation. We

would not expect the Tribes would hold any veto power over these matters. The critical inquiry in this case is whether the SMCRA restricts the Navajo in a meaningful way concerning economic matters such as the negotiation of royalties.

When the Navajo's remand brief does finally shift focus to royalties it provides mere citations without expounding upon them. At most, Plaintiff credits the regulations for establishing the Bureau of Land Management and the Minerals Management Service as the Federal agency arms responsible for enforcing certain coal lease terms and collecting and accounting for royalties and other income from Indian mineral agreements. *See* 30 C.F.R. § 750.6(c)-(d); Pl. Remand Br. at 25. If there was a case to be made that these provisions established trust duties with respect to establishing royalty rates, the Navajo failed to make the connection. At most, these regulations implicate duties of care in collection and accounting of royalties. There is no apparent issue with regard to those aspects of the Navajo–Peabody lease. Unlike other Indian trust cases, here the allegations of breach do not involve the Secretary's auditing and accounting functions. The Navajo's Complaint involves a breach of lease approval function, and by extension, the approval of amendments such as the royalty rate "negotiated" by the Tribe and Peabody.

Finally, the remand brief presents once again the FOGRMA. In granting summary judgment several years ago, we had occasion to comment on this particular statute. But we did so not because Plaintiff relied extensively upon the statute (FOGRMA merited no more than a mere citation in Plaintiff's Complaint), but in order to distinguish the Government's regulation of royalties under oil and gas lease from that in the coal-mining context.

The statute and pertinent regulations were considered by the Court strictly in the context of distinguishing the *Pawnee* case, which found a trust based upon the royalty provisions that apply to oil and gas leases under FOGRMA. *Navajo I*, 46 Fed.Cl. at 232 ("One of the statutes relied upon by the Pawnee is entirely dedicated to management of oil and gas royalties. The two statutes—

the Indian Long–Term Leasing Act, 25 U.S.C. § 396 (1988) and the Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. §§ 1701 (1988)—and a large body of regulations gave the Secretary broad authority in leasing property and in collecting royalties on behalf of the Indians. In sum, those authorities clearly demonstrated that 'the United States has exercised its supervisory authority over oil and gas leases in considerable detail.' *Pawnee*, 830 F.2d at 190 (quoting *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968)).")

When FOGRMA was urged upon us again in Navajo Nation's Rule 59 motion, we rejected it as a basis for Tucker Act jurisdiction under *Mitchell II* in summary fashion. We asserted our familiarity with the arguments, particularly those respecting the controlling effect of *Pawnee*. As we indicated then: "the Navajo Nation had ample opportunity to persuade the Court that the jurisdictional prerequisites were met. It was unsuccessful." *Navajo II* at 3.

We find nothing new in Plaintiff's arguments on remand. The Tribe persists in arguing that we wrongly distinguished the *Pawnee* case, and that we erred in finding that regulation of royalties for coal leases is less extensive than that for oil and gas royalties. *See* Pl. Remand Br. at 35–36 ("[F]ederal management and control over Indian coal resources is at least equal to, and in many cases much more extensive and pervasive than that concerning Indian oil and gas resource development.") Indeed the Plaintiff characterized ours as a "novel view," Reply Br. for Appellant (Dec. 1, 2000) at 9. This aspect of our opinion has not been specifically addressed by the Court of Appeals, although the Supreme Court recognized that IMLA and its regulations treat coal leases and oil and gas leases differently. *See Navajo V*, 537 U.S. at 494, 507 n. 11, 123 S.Ct. 1079.

The Navajo Nation continues to fault what it characterizes as our "myopic" approach in requiring the Tribe to link the violations it complains of to established fiduciary duties which could be fairly interpreted as mandating compensation. *See e.g.*, Tr. at 4; Reply

Br. of the Navajo Nation on Remand at 4. The Supreme Court implicitly approved of our reasoning, however. *See Navajo IV*, 537 U.S. at 513, 123 S.Ct. 1079 (Turning to the *ex parte* contact allegations, the Court observed, "Here again, as the Court of Federal Claims ultimately determined, see *supra*, at 1088, the Tribe's assertions are not grounded in a specific statutory or regulatory provision that can be fairly be interpreted as mandating money damages"); *but see, United States v. White Mountain Apache*, 537 U.S. 465, 477, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (considered in tandem with the *Navajo Nation* case) and Pl. Remand Br. at 34 (arguing that *White Mountain* relaxed the test for Tucker Act jurisdiction). To the extent Plaintiff's arguments on remand merely attack these earlier conclusions of ours, we necessarily reject those arguments.

We have followed the Court of Appeals instruction to ignore IMLA in our consideration of other statutes and regulations that may establish compensable trust duties. But pivotal to the Supreme Court's holding in this case, and its rationale for aligning the Navajo's claim with *Mitchell I* as opposed to *Mitchell II*, is the Court's interpretation of IMLA's statutory purpose:

> Moreover, as in *Mitchell I*, imposing fiduciary duties on the Government here would be out of line with one of the statute's principal purposes. The [General Allotment Act] was designed so that "the allottee, and not the United States, ... [would] manage the land." Imposing upon the Government a fiduciary duty to oversee the management of allotted lands would not have served that purpose. So too here. The IMLA aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties. As the Court of Federal Claims recognized, "[t]he ideal of Indian self-determination is directly at odds with Secretarial control over leasing."

*Navajo IV*, 537 U.S. at 508, 123 S.Ct. 1079 (internal citations omitted).

## *CONCLUSION*

In deciding this case we rejected the network theory:

In *Pawnee* the Court cited a litany of regulatory provision dealing specifically with aspects of the management of royalties, the very item of which those plaintiff's complained. In our case, the regulations and statutory provisions cited by the Navajo cover a wide range of issues from mining operations to rights-of-way, but touch only summarily on the topic of royalties. See Pl. Br. at 34 (citing 25 C.F.R. Part 211 (1985); 25 C.F.R. Part 169 (1985); 25 C.F.R. Part 200 (1993); and 25 C.F.R. Part 216 (1985)).

*Navajo I*, 46 Fed.Cl. at 232.

Although Plaintiff marshaled voluminous catalogues of regulatory provisions, it never joined the ultimate issue. As we pointed out then, the Government "concedes that the Secretary owes some measure of trust responsibility, but argues that the responsibility as it relates to coal royalties does not rise above a generalized trust obligation." *Id.* It is that added step—to demonstrate unambiguously under the statutes and regulations "that the United States has undertaken full fiduciary responsibilities *as to the particular aspect of the relationship complained of*"—that Plaintiff could not satisfy. *See Navajo I*, 46 Fed.Cl. at 233 (citing *Wright*, 32 Fed.Cl. at 56) (internal quotations omitted).

Here on remand, the Tribe continues to rely on this asserted trust relationship, without defining the particular trust obligation in a manner which would lead us to conclude that the breach is actionable in this Court.

We have already found that Plaintiff's statutory and regulatory framework with IMLA does not suffice to establish a money-mandating trust in the area of royalty rates. On remand, *a fortiori*, those same statutes and regulations, apart from IMLA, fail to establish a compensable trust.

Since we do not have occasion to revise our original judgment of dismissal, we need not address the conditional aspects of the Circuit Court's remand.

**IT IS SO ORDERED.**