# United States Court of Appeals for the Federal Circuit

2006-5059

THE NAVAJO NATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Paul E. Frye, Frye Law Firm, P.C., of Albuquerque, New Mexico, argued for plaintiff-appellant. With him on the brief was Lisa M. Enfield. Of counsel on the brief was Daniel I.S.J. Rey-Bear, The Nordhaus Law Firm, of Albuquerque, New Mexico, and Louis Denetsosie, Attorney General, The Navajo Nation, of Window Rock, Arizona.

Todd S. Aagaard, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief was Sue Ellen Wooldridge, Assistant Attorney General.

Appealed from: United States Court of Federal Claims

Judge Lawrence M. Baskir

# United States Court of Appeals for the Federal Circuit

2006-5059

THE NAVAJO NATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  September 13, 2007

_____


Before GAJARSA, <u>Circuit Judge</u>, PLAGER, <u>Senior Circuit Judge</u>, and MOORE, <u>Circuit Judge</u>.

GAJARSA, <u>Circuit Judge</u>.

The threshold question in this case is whether the Navajo Nation ("Nation" or "Tribe") has a cognizable money-mandating claim under 28 U.S.C. § 1505, known as the Indian Tucker Act, against the United States for a breach of trust in a lease of the Nation's lands for coal mining to Peabody Coal Co. ("Peabody").  Only if there is such a claim, may we evaluate whether the United States breached its trust duties based on the parties' cross-motions for summary judgment.

In <u>United States v. Navajo Nation</u> ("<u>Navajo III</u>"), 537 U.S. 488 (2003), the Supreme Court held that the Act of May 11, 1938 ("Indian Mineral Leasing Act of 1938" or "IMLA of 1938"), ch. 198, 52 Stat. 347, 25 U.S.C. § 396a-g, and its implementing regulations do not constitute the substantive source of law required to establish such a

claim and remanded for further proceedings consistent with its opinion. Navajo III, 537 U.S. at 514. Because Navajo III did not address whether the network of other statutes and regulations asserted by the Nation provides the required substantive source of law, we remanded to the Court of Federal Claims to consider the question. Navajo Nation v. United States ("Navajo IV"), 347 F.3d 1327, 1332 (Fed. Cir. 2003). On remand, the Court of Federal Claims found that the Nation's asserted network of other statutes and regulations failed "to establish a money-mandating trust in the area of royalty rates." Navajo Nation v. United States ("Navajo V"), 68 Fed. Cl. 805, 815 (2005). The Nation appealed.

The Supreme Court stated in United States v. White Mountain Apache Tribe, 537 U.S. 465 (2003), that "[i]t is enough . . . that a statute creating a[n Indian] Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a[n Indian] Tucker Act claim will not be 'lightly inferred,' a fair inference will do." Id. at 473 (citation omitted). Because the governing law establishes such a fair inference in this case and because the undisputed facts as determined by the Court of Federal Claims demonstrate that the government breached its trust duties, we reverse the decision of the Court of Federal Claims and remand for further proceedings consistent with this opinion.

## I.

### A. Background Facts

The facts of this case are undisputed and have been detailed by the Court of Federal Claims in Navajo Nation v. United States ("Navajo I"), 46 Fed. Cl. 217, 221-24 (2000), this court in Navajo Nation v. United States ("Navajo II"), 263 F.3d 1325, 1327-

28 (Fed. Cir. 2001), and the Supreme Court in <u>Navajo III</u>, 537 U.S. at 495-500. Because of the prior detail, we provide only a brief factual summary here.

The Navajo reservation is the largest Indian reservation in the United States and spans parts of Arizona, New Mexico, and Utah. The United States holds the Nation's reservation lands in trust for the Nation pursuant to a treaty, an executive order, and two Congressional acts. <u>See</u> <u>infra</u> Part III.D.1. Over the past century, large coal deposits have been discovered on these lands. <u>Navajo III</u>, 537 U.S. at 495.

In 1964, the Nation and the predecessor of Peabody[1] executed Lease 14-20-0603-8580 ("Lease 8580"), which became effective when the Secretary of the Department of the Interior approved it that year. <u>Navajo I</u>, 46 Fed. Cl. at 221. Lease 8580 granted Peabody the "exclusive right and license to prospect, mine, and strip" 24,858 acres of the Nation's reservation in Arizona for coal. In return, the lease established royalties of not more than 37.5 cents per ton. The lease also provided, however, that "the royalty provisions of this lease are subject to reasonable adjustment by the Secretary of the Interior . . . at the end of twenty years from the effective date of this lease."

As the twenty-year anniversary approached in 1984, it became apparent that the 37.5 cents per ton maximum royalty was "by any measure, an inequitable deal" for the Nation and was "substantially lower" than the 12.5% minimum royalty set by Congress in 1977 for coal mined on federal lands. <u>Navajo I</u>, 46 Fed. Cl. at 222; <u>Navajo III</u>, 537 U.S. at 496. In March 1984, the Nation wrote the Secretary of the Interior, William Clark, asking him to make a reasonable adjustment of the royalty rate as provided by

---

[1] Hereinafter, we refer to Peabody and its predecessor as "Peabody."

Lease 8580.  In June 1984, after considering the "reports and recommendations from the Bureau's Navajo Area and Energy and Mineral Resources Offices, the Bureau of Mines and others," the Area Director of the Bureau of Indian Affairs for the Navajo Area, pursuant to authority delegated by the Secretary, issued a final decision adjusting the royalty rate of Lease 8580 to 20% of gross proceeds.  Navajo III, 537 U.S. at 496.

In July 1984, Peabody filed an administrative appeal, which was

> referred to the Deputy Assistant Secretary for Indian Affairs, John Fritz, then acting as both Commissioner of Indian Affairs and Assistant Secretary of Indian Affairs.  In March 1985, Fritz permitted Peabody to supplement its brief and requested additional cost, revenue, and investment data.  He thereafter appeared ready to reject Peabody's appeal.  By June 1985, both Peabody and the Tribe anticipated that an announcement favorable to the Tribe was imminent.

Navajo III, 537 U.S. at 496 (citations omitted).

In July 1985, Peabody wrote a letter to the new Secretary of the Interior, Donald Hodel, seeking either to postpone the decision reviewing the royalty adjustment or to issue a ruling in Peabody's favor.  The Nation received a copy of the letter and submitted its own to Secretary Hodel, "urging the Secretary to reject Peabody's request and to secure the Department's prompt release of a decision in the Tribe's favor."  Id. at 497 (citations omitted).

Later that month, Peabody retained Stanley Hulett, who was described in a Peabody company memorandum as "a former upper level Department of Interior employee" believed to have "influence with the current Secretary of Interior (Don Hodel)."  The government conceded in this case that Hulett was "a former aide and friend of Secretary Hodel."  See Navajo III U.S. Br., 2002 WL 1968199, at *8.  Hulett met with the Secretary without a representative of the Nation being present, and the

Nation never received notification of the meeting.  Navajo III, 537 U.S. at 497.  "On or shortly after the date of the ex parte meeting, Secretary Hodel signed a memorandum prepared by Peabody, making only one insignificant change in the company's draft."  Navajo I, 46 Fed. Cl. at 222-23.  Secretary Hodel addressed to Fritz the memorandum, which stated in part:

> I suggest that you inform the involved parties that a decision on this appeal is not imminent and urge them to continue with efforts to resolve this matter in a mutually agreeable fashion.
>
> . . . .
>
> I wish to assure you, however, that this memorandum is not intended as a determination of the merits of the arguments of the parties with respect to the issues which are subject to the appeal.  If it becomes inevitable that such a determination must be made by the Department, then we can discuss it at that time.

The Nation was not advised of this memorandum but "learned that someone from Washington had urged a return to the bargaining table.  Facing severe economic pressure, the Tribe resumed negotiations with Peabody in August 1985."  Navajo III, 537 U.S. at 498 (quotation marks and citations omitted).

In September 1985, Peabody and the Nation reached a tentative settlement agreement on a package of amendments.  The amendments were approved by the Navajo Tribal Council in August 1987, signed by the parties in a final agreement in November 1987, and approved by Secretary Hodel in December 1987.  Id. at 500.  The amended lease raised the royalty rate to 12.5% for Lease 8580.  In addition, the amendments raised the royalty rate for two other existing leases, which did not contain Lease 8580's reasonable adjustment provision, resolved a broad range of issues between Peabody and the Nation, and added 90 million tons of coal to the 200 million

tons originally leased from the Nation's reservation lands in Arizona. The amendments acknowledged that the parties could have executed a separate lease or leases to mine the additional coal, but instead, decided to amend the lease "in consideration for various additional undertakings of Peabody." Without its exhibits, the amendments numbered more pages than the original Lease 8580.

## B. Procedural History

In 1993, the Nation brought suit seeking $600 million in damages against the United States in the Court of Federal Claims. Navajo I, 46 Fed. Cl. at 225. The first amended complaint asserted that the "leasing of coal of the Navajo Nation is subject to a comprehensive statutory and regulatory scheme of the United States"; that the government "claimed and exercised broad authority and control over the leasing of coal it holds in trust for the Navajo Nation"; and that the government violated its statutory and fiduciary duties to the Nation "by, inter alia, approving the amendments to the Lease on December 14, 1987, causing economic loss to the Navajo Nation, a diminution of the value of the trust res, and harm to the sovereignty of the Navajo Nation."

On cross-motions for summary judgment on the issue of liability, while finding "that the United States violated the most fundamental fiduciary duties of care, loyalty and candor," the Court of Federal Claims held that the Nation "failed to present statutory authority which can be fairly interpreted as mandating compensation for the government's fiduciary wrongs." Navajo I, 46 Fed. Cl. at 227, 236. Specifically, according to the Court of Federal Claims, neither the IMLA of 1938 nor its implementing regulations, 25 C.F.R. Part 211 (1985), imposed "specific duties regarding the Secretary's adjustment of royalty rates for coal." Id. at 234. Similarly, 25 C.F.R. Parts

169 (1985) (rights-of-way over Indian lands), 200 (1993) (terms and conditions of coal leases), and 216 (1985) (surface exploration, mining, and reclamation of lands) failed to provide a money mandating cause of action because they merely "touch[ed] summarily on the topic of royalties." See id. at 232. The Court of Federal Claims granted summary judgment in favor of the government.

On appeal, this court reversed and remanded. Navajo II, 263 F.3d at 1333. Specifically, this court held that the IMLA of 1938, its implementing regulations, and the Act of Jun. 30, 1919 ("Act of 1919"), ch. 4, § 26, 41 Stat. 31, 25 U.S.C. § 399, provided the authority for a claim for damages within the jurisdiction of the Court of Federal Claims. Navajo II, 263 F.3d at 1328-33.

The Supreme Court granted certiorari, reversed, and remanded. Navajo III, 537 U.S. at 514. The Court held that "the IMLA [of 1938] and its regulations do not assign to the Secretary managerial control over coal leasing. Nor do they even establish the 'limited trust relationship'" of United States v. Mitchell ("Mitchell I"), 445 U.S. 535, 542 (1980). Navajo III, 537 U.S. at 506-08, 512-13. The Court also stated that reliance on 25 U.S.C. § 399 was misplaced and that the Nation's lease fell outside the domain of the Act of Dec. 22, 1982 ("Indian Mineral Development Act of 1982" or "IMDA of 1982"), Pub. L. No. 97-382, 96 Stat. 1938, 25 U.S.C. §§ 2101-08. Navajo III, 537 U.S. at 509.

We subsequently remanded to the Court of Federal Claims with instructions. Navajo IV, 347 F.3d at 1332. Finding the Supreme Court's Navajo III decision limited to the IMLA of 1938, 25 U.S.C. § 399, and the IMDA of 1982, this court directed the Court of Federal Claims (1) to "determine whether, as the government asserts, the Tribe waived a claim with respect to 'a network of other statutes and regulations,'" and if not,

(2) to "decide, whether, apart from IMLA [of 1938], section 399, and IMDA [of 1982], a 'network of other statutes and regulations' imposes 'judicially enforceable fiduciary duties upon the United States.'" Navajo IV, 347 F.3d at 1333.

On remand, the Court of Federal Claims found no waiver because the Nation's "advocacy on behalf of jurisdiction always included the network argument." Navajo V, 68 Fed. Cl. at 810. The Court of Federal Claims concluded, however, that the network of other statutes and regulations "does not suffice to establish a money-mandating trust in the area of royalty rates." Id. at 815. The Nation appealed to this court.

This court has jurisdiction of the appeal pursuant to 28 U.S.C. § 1295(a)(3).

**II.**

A. Standard of Review

The threshold issue in this appeal, as with the five previous Navajo decisions, is whether the Nation has stated a claim cognizable under 28 U.S.C. § 1505, known as the Indian Tucker Act. This is an issue of law that this court reviews without deference. Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (en banc in pertinent part) ("The trial court's determination regarding the money-mandating character of the statute at issue is of course subject to appellate review as a question of law.").

The Court of Federal Claims applies the same summary judgment standard as that of federal district courts: summary judgment is proper if the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Ct. Fed. Cl. R. 56(c); Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1337 (Fed. Cir. 2005). Therefore, if

the Nation has stated a claim cognizable under the Indian Tucker Act, we review without deference whether the United States breached its trust duties.  SmithKline, 403 F.3d at 1337.

## B.  Legal Standard

The Supreme Court's decisions in Mitchell I, 445 U.S. 535, United States v. Mitchell ("Mitchell II"), 463 U.S. 206 (1983), Apache, 537 U.S. 465, and Navajo III, 537 U.S. 488, control this case.  As explained in Apache:

> Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver.  The terms of consent to be sued may not be inferred, but must be "unequivocally expressed" in order to "define [a] court's jurisdiction." The Tucker Act contains such a waiver, giving the Court of Federal Claims jurisdiction to award damages upon proof of "any claim against the United States founded either upon the Constitution, or any Act of Congress," and its companion statute, the Indian Tucker Act, confers a like waiver for Indian tribal claims that "otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe."

> Neither Act, however, creates a substantive right enforceable against the Government by a claim for money damages.  As we said in Mitchell II, a statute creates a right capable of grounding a claim within the waiver of sovereign immunity if, but only if, it "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained."

> This "fair interpretation" rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity. "Because the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations need not provide a second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity."  It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages.  While the premise to a Tucker Act claim will not be "lightly inferred," a fair inference will do.

537 U.S. at 472-73 (modification in original, citations omitted, emphasis added); see also Navajo III, 537 U.S. at 506 (stating that courts must "determine whether the relevant source of substantive law can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s]" (modifications in original, citation and quotation marks omitted)).

The Supreme Court's pathmarking precedents guide courts in determining "when it is fair to infer a fiduciary duty qualifying under the Indian Tucker Act and when it is not." Apache, 537 U.S. at 473; see also Gregory C. Sisk, Yesterday and Today: Of Indians, Breach of Trust, Money, and Sovereign Immunity, 39 Tulsa L. Rev. 313 (2003).

In Mitchell I,

> 1,465 individual allottees of land contained in the Quinault Reservation, the Quinault Tribe, which now holds some allotments, and the Quinault Allottees Association, an unincorporated association formed to promote the interests of the allottees of the Quinault Reservation . . . . sought to recover damages from the Government for alleged mismanagement of timber resources found on the Reservation.

445 U.S. at 537. Acknowledging that the Act provided that the United States held "'the land thus allotted . . . in trust for the sole use and benefit of the Indian to whom such allotment shall have been made,'" the Court held that "the General Allotment Act[, ch. 119, 24 Stat. 388 (codified as amended in scattered sections of 25 U.S.C.)] . . . cannot be read as establishing that the United States has a fiduciary responsibility for management of allotted forest lands." Mitchell I, 445 U.S. at 540-41 (quoting 25 U.S.C. § 348), 546. In so holding, the Court found it relevant that "Congress subsequently enacted other legislation directing the Secretary on how to manage Indian timber resources." Mitchell I, 445 U.S. at 544-46.

Three years later, this "other legislation" noted in Mitchell I succeeded where the General Allotment Act failed. Specifically, in Mitchell II, the Court held that the asserted network of statutes and regulations could "fairly be interpreted as mandating compensation by the Federal Government for violations of its fiduciary responsibilities in the management of Indian property," including the alleged mismanagement of timber resources. 463 U.S. at 228. The Court reasoned that the statute and regulations (i) establish "'comprehensive' responsibilities of the Federal Government in managing the harvesting of Indian timber" (ii) for the benefit of the Indian owner and his heirs. See id. at 222-24; see also Navajo III, 537 U.S. at 504-06 (discussing Mitchell II); Apache, 537 U.S. at 473-74 (same).

Similarly, in Apache, the Court held that the White Mountain Apache Tribe had a cognizable claim "against the United States for breach of fiduciary duty to manage land and improvements held in trust for the Tribe but occupied by the Government." 537 U.S. at 468. The Court found it fair to infer a fiduciary duty because: (i) the statute provides that "the former Fort Apache Military Reservation" is "held by the United States in trust for the White Mountain Apache Tribe"; (ii) the statute subjects the trust property "to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for that purpose"; (iii) the government availed itself of that option by occupying the trust corpus; and (iv) "elementary" and "fundamental common-law" trust law imposes a duty on a trustee to preserve and maintain trust assets. Id. at 469, 475.

In Navajo III, argued and decided on the same days as Apache, the Court reached a different result. The Court held that the Indian Mineral Leasing Act of 1938

and its implementing regulations could not "fairly be interpreted as mandating compensation for the Government's alleged breach of trust" in approving amendments to a coal lease even though Peabody exerted ex parte influence on the Secretary of the Interior. Navajo III, 537 U.S. at 506. The Court reasoned that the IMLA of 1938 and its implementing regulations: (i) did not, at the relevant time, "contain any trust language with respect to coal leasing"; (ii) "aim[ed] to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties"; (iii) failed to assign the government a "comprehensive managerial role" rising to the level of Mitchell II; and (iv) provided "no guides or standards circumscribing the Secretary's affirmation of coal mining leases negotiated between a Tribe and a private lessee" that were allegedly violated. Navajo III, 537 U.S. at 507-11. In discussing Mitchell II, however, the Court continued to state that a network of statutes and regulations could "impose judicially enforceable fiduciary duties upon the United States." Navajo III, 537 U.S. at 504-05. The Court "remanded for further proceedings consistent with [the Navajo III] opinion." Id. at 514.

## III.

Against this backdrop, we must now consider whether the statutes and regulations at issue in this appeal are reasonably amenable to the reading that they mandate a right of recovery in damages against the government under the Indian Tucker Act. While the Supreme Court held in Mitchell I that the General Allotment Act alone is insufficient, the Court held in Mitchell II that the network of statutes and regulations asserted by the allottees of land is reasonably amenable to mandating compensation by the federal government for violations of its fiduciary responsibilities,

2006-5059                                          12

including the alleged mismanagement of timber resources. Similarly, in this case, while the Court held in Navajo III that the IMLA of 1938, 25 U.S.C. § 399, and the IMDA of 1982 are insufficient, our task is to determine whether the network of other statutes and regulations asserted by the Nation in this appeal is reasonably amenable to a reading that they mandate compensation by the federal government for violating its common law fiduciary trust duties and the duties imposed by the network. Only if the network is so reasonably amenable, may we evaluate whether the United States government breached its duties based on the parties' cross-motions for summary judgment.

We note at the outset that this is not a case where the government had the discretion to exercise control and did not do so. Rather, in this case, the government exerted actual and significant control over the determination of the increased royalty rate in the lease amendments because its approval was required by law. In March 1984, the Nation requested that the Secretary of the Interior, who was then William Clark, make a reasonable adjustment of the royalty rate as provided by the coal lease. In July 1985, the Secretary, who was now Donald Hodel, effectively refused to make any permanent adjustments after meeting with Peabody's representative, whom the government conceded was "a former aide and friend of Secretary Hodel." The Nation sought Secretarial approval precisely because the government exercised control over the leasing of coal resources. This active and effective assumption of control resulted in, as the Court of Federal Claims found, "Navajo enter[ing] the process unarmed with critical knowledge" and unaware "that it no longer had [a] competitive edge in its bargaining while the companies were well aware of the fact." Navajo I, 46 Fed. Cl. at 227. "Then after very briefly reviewing the merits of the proposals, the Secretary

approved lease amendments with royalty rates well below the rate that had previously been determined appropriate by those agencies responsible for monitoring the federal government's relations with Native Americans." Id. at 226-27. Faced with a claim for damages for this exercise of control, the government now takes the opposite stance, asserting that it had no control—statutory, regulatory, or otherwise—regarding the determination of the royalty rate in lease amendments. The law does not allow the government to have it both ways. That is, the government cannot assume comprehensive control of the Nation's coal, as it did here, and disclaim liability for exercising such control.

A. Network Asserted by the Nation

The Nation presents an array of authorities that, it asserts, cumulatively establish a money-mandating source for its claim. The Nation's asserted network includes: (i) the Treaty with the Navajo ("Treaty of 1849"), Sept. 9, 1849, 9 Stat. 974; (ii) the Treaty Between the United States of America and the Navajo Tribe of Indians ("Treaty of 1868"), Aug. 12, 1868, 15 Stat. 667; (iii) Exec. Order of May 17, 1884 ("Executive Order of 1884"); (iv) the Act of June 14, 1934 ("Act of 1934"), ch. 521, 48 Stat. 960; (v) the Act of April 17, 1950 ("Navajo-Hopi Rehabilitation Act of 1950"), ch. 92, 64 Stat. 44, 25 U.S.C. §§ 631-40; (vi) the Indian lands section, 30 U.S.C. § 1300, of the Act of August 3, 1977 ("Surface Mining Control and Reclamation Act of 1977"), Pub. L. No. 95-87, 91 Stat. 445 (codified as amended in scattered sections of 30 U.S.C.); (vii) the regulations, 25 C.F.R. Part 216 Subpart B (1987) and 30 C.F.R. Part 750 (1987), promulgated

pursuant to the Surface Mining Control and Reclamation Act of 1977;[2] and (viii) the Act of January 12, 1983 ("Federal Oil and Gas Royalty Management Act of 1983"), 30 U.S.C. §§ 1701-57, and its implementing regulations, 30 C.F.R. Parts 212, 216, and 218 (1987), and 30 C.F.R. Part 206 Subpart F (1989).

The Nation also asserts that the following may contribute to its asserted network: (ix) the policies of the Department of the Interior; (x) the provisions of Lease 8580; (xi) the Act of February 5, 1948 ("Indian Lands Rights-of-Way Act of 1948"), 25 U.S.C. §§ 323-28, and its implementing regulations, 25 C.F.R. Part 169 (1987); and (xii) the IMLA of 1938 and its implementing regulations.

B. <u>Relevance and Preservation of Network Elements Other Than IMLA of 1938</u>

At the threshold, the government asserts that the statutes and regulations asserted by the Nation are irrelevant because "Lease 8580 is an IMLA lease, and the Secretary's approval occurred pursuant to IMLA, not any of the provisions upon which the Tribe now relies for its 'network.'" U.S. Br. 34. Nothing within the IMLA of 1938 suggests, however, that it governs particular leases to the exclusion of all other statutes and regulations. The repeal provision of the IMLA of 1938, § 7, applies only to acts or parts of acts existing prior to and inconsistent with the IMLA. Moreover, the Act expressly contemplates that its provisions interact with those of other laws. <u>See</u> IMLA of 1938, § 7, 25 U.S.C. § 396d ("All operations under any oil, gas, or other mineral lease issued pursuant to the terms of sections 396a to 396g of this title or any other Act affecting restricted Indian lands shall be subject to the rules and regulations

---

[2]    In <u>Navajo V</u>, the Court of Federal Claims noted that the Nation's asserted network also included 30 C.F.R. Part 955. 68 Fed. Cl. at 808. Because the Nation has not cited this regulation anywhere in its briefs in this appeal, we do not consider those regulations here.

promulgated by the Secretary of the Interior."). Therefore, the court rejects the government's argument that the IMLA of 1938 is the only possible substantive source of law in this case.

As an alternative ground for affirmance, the government asserts that the Nation waived its breach of trust claim based on a network of statutes and regulations. The government's waiver argument fails for several reasons.

First, after reviewing the complaint, summary judgment briefs, motion for reconsideration briefs, briefs to this court in its first appeal, and briefs to the Supreme Court, the Court of Federal Claims concluded that the Nation's "advocacy on behalf of jurisdiction always included the network argument, albeit in a secondary role." Navajo V, 68 Fed. Cl. at 810. The government does not dispute this conclusion, and that alone should defeat its waiver argument. Similarly, we can find no error and thus affirm the Court of Federal Claims on this issue.

Second, "[i]t is indeed the general rule that issues must be raised in lower courts in order to be preserved as potential grounds of decision in higher courts. But this principle does not demand the incantation of particular words; rather, it requires that the lower court be fairly put on notice as to the substance of the issue." Nelson v. Adams USA, Inc., 529 U.S. 460, 469 (2000); see also Caterpillar Inc. v. Sturman Indus., Inc., 387 F.3d 1358, 1371 (Fed. Cir. 2004) (noting that rationales of waiver doctrine are to encourage parties to develop a full record of the case and to inform "the court about potential errors so as to put the court on notice of mistakes that, if left uncorrected, may result in reversal on appeal"). By asserting a breach of trust claim based on a network of statutes and regulations including the IMLA of 1938, the Nation preserved a breach of

trust claim based on a network of statutes and regulations regardless of whether the IMLA of 1938 is included. The waiver doctrine does not require, as the government asserts, that the Nation preserve each particular network permutation.

Third, the "matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton v. Wulff, 428 U.S. 106, 121 (1976); see also Harris Corp. v. Ericsson Inc., 417 F.3d 1241, 1251 (Fed. Cir. 2005) ("An appellate court retains case-by-case discretion over whether to apply waiver." (citations omitted)). For example, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991).

We conclude that there was no applicable waiver, and we proceed to evaluate the network of statutes and regulations asserted by the Nation in this case.

C. Non-Money-Mandating Elements of the Nation's Asserted Network

For completeness, we briefly address the Nation's assertion of elements (ix) through (xii), none of which we find contribute to a money-mandating network.

The departmental policies cannot provide the substantive source of law that mandates compensation for the government's alleged breach of trust. As the Supreme Court has noted, "[j]urisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver." Apache, 537 U.S. at 472. The Indian Tucker Act, 28 U.S.C. § 1505, provides the waiver of sovereign immunity in this case and states that

the claim must be "one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims."  The Tucker Act, 28 U.S.C. § 1491(a), defines claims cognizable in the Court of Federal Claims as "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States."  Neither the Indian Tucker Act nor the Tucker Act provides for claims based on departmental policies, which are not regulations that have the force of law. Cf. Schweiker v. Hansen, 450 U.S. 785, 789-90 (1981) (stating that Claims Manual of Social Security Administration is not regulation, has no legal force, and does not bind Administration); Morton v. Ruiz, 415 U.S. 199, 234-36 (1974) (stating that Bureau of Indian Affairs Manual has no force of law, but holding nonetheless, that Manual must be followed under Administrative Procedure Act); Hamlet v. United States, 63 F.3d 1097, 1105-06 (Fed. Cir. 1995) (stating that internal personnel manual may, if three other requirements are met, have the force and effect of law because matters relating to agency personnel are "exempt from the strict procedural requirements found in the [Administrative Procedure Act]").  Therefore, any claims based on departmental policies would not fall within the scope of the asserted waiver of sovereign immunity.

For similar reasons, Lease 8580 does not constitute a substantive source of law for the Nation's breach of trust claim.  The Nation asserts that a mineral lease is a "fundamental document," which may form part of the network establishing government trust liability.  It is true that the Supreme Court suggested that a breach of trust claim under the Indian Tucker Act may arise from a "statute (or other fundamental

document).'" See Mitchell II, 463 U.S. at 225 (quoting Navajo Tribe of Indians v. United States, 624 F.2d 981, 987 (Ct. Cl. 1980)) (emphasis added). It is also true that claims founded "upon any express or implied contract with the United States" are cognizable under the Tucker Act, 28 U.S.C. § 1491(a). The Supreme Court, however, rejected this exact argument in Navajo III.

> [T]he Court of Federal Claims determined, and the Tribe does not here dispute, that the Secretary is not a signatory to the Lease and that the Lease is not contractually binding on him. We thus perceive no basis for infusing the Secretary's approval function under § 396a with substantive standards that might be derived from his adjustment authority under the Lease, and certainly no basis for concluding that an alleged "breach" of those standards is cognizable in an action for money damages under the Indian Tucker Act.

537 U.S. at 510 n.13. This court perceives no basis or authority for concluding otherwise.

Next, the Indian Lands Rights-of-Way Act of 1948 and its implementing regulations do not provide a relevant substantive source of law. The Act empowers the Secretary of the Interior "to grant rights-of-way for all purposes, subject to such conditions as he may prescribe" and to "the consent of the proper tribal officials." 25 U.S.C. §§ 323-24. Seizing on the Supreme Court's discussion of these statutes in Mitchell II, 463 U.S. at 223, the Nation in this case asserts that the government's "comprehensive control over Indian rights-of-way augments its control over Navajo coal development even more than it did over timber production in Mitchell II." Nation Br. 36. The rights-of-way statutes, however, did not augment the government's control over timber production; rather, the Court cited the statutes as a point of comparison. See Mitchell II, 463 U.S. at 223 (concluding that timber management statutes and

regulations establish comprehensive government control and then, stating that "Department exercises comparable control over grants of rights-of-way on Indian lands held in trust"). Similarly, in this case, while other regulations that are properly part of the Nation's asserted network may require permits for surface coal mining operations activities for "lands affected by the construction of new roads or the improvement or use of existing roads to gain access," see infra Part III.D.3 (30 C.F.R. § 750.11(a) (1987)), the Indian Lands Rights-of-Way Act of 1948 and its implementing regulations do not augment the government's control of the Nation's coal and thus are not part of the relevant network.

Lastly, the Nation asserts the IMLA of 1938 and its regulations, 25 C.F.R. Part 211 (1987) and Part 216 Subpart A (1987). This court's consideration of the IMLA of 1938 and its regulations, however, is foreclosed by Navajo IV, 347 F.3d at 1332 (directing Court of Federal Claims to consider whether network of other statutes and regulations apart from IMLA of 1938 establishes cognizable breach of trust claim). While there is persuasive force in Judge Newman's dissent stating "[t]hat the Indian Mineral Leasing Act is insufficient standing alone does not bar adding its weight to the totality of statutes, treaties, and regulations governing mineral leasing," id. at 1333 (Newman, J., dissenting), the previous decision is law of the case.

Accordingly, we find that the departmental policies, the provisions of Lease 8580, the Indian Lands Rights-of-Way Act of 1948 and its implementing regulations, and the IMLA of 1938 and its implementing regulations cannot be substantive sources of law on which the Nation may base its breach of trust claim.

D.  Money-Mandating Elements of the Nation's Asserted Network

*1. Existence of Trust Relationship and Trust Language*

There is no question the Treaty of 1849 establishes a general trust relationship. Specifically, the treaty states that the Navajo "tribe was lawfully placed under the exclusive jurisdiction and protection of the Government of the said United States, and that they are now, and will forever remain, under the aforesaid jurisdiction and protection" and "that the Government of the United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians."  Art. I, XI.  While this general trust relationship is potentially reinforcing of "the conclusion that the relevant statute or regulation imposes fiduciary duties, that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act."  Navajo III, 537 U.S. at 506 (citation omitted).

There must be "specific rights-creating or duty-imposing statutory or regulatory prescriptions.  Those prescriptions need not, however, expressly provide for money damages; the availability of such damages may be inferred."  Id.  In Apache, the Court found it significant that a statute provided that the Fort Apache Military Reservation would be "held by the United States in trust for the White Mountain Apache Tribe."  See 537 U.S. 468-69, 474-75 (quoting the Act of Jan. 24, 1923, ch. 42, 42 Stat. 1187).  In Mitchell II, the statutes and regulations gave the government "full responsibility to manage Indian resources and land for the benefit of the Indians."  463 U.S. at 224; see also Navajo III, 537 U.S. at 504-05 (discussing Mitchell II); Apache, 537 U.S. at 474 (same).  Even the statute at issue in Mitchell I went beyond the general trust relationship and established a "limited" trust relationship by stating that "the United

States does and will hold the land thus allotted . . . in trust for the sole use and benefit of the Indian to whom such allotment shall have been made." 445 U.S. at 540-42 (quoting General Allotment Act); see Mitchell II, 463 U.S. at 224-25 (discussing Mitchell I limited trust relationship and general trust relationship); see also Navajo III, 537 U.S. at 504 (discussing Mitchell I); Apache, 537 U.S. at 473 (same).

In contrast, the Court found that the IMLA of 1938 and its regulations did not satisfy this statutory and regulatory language threshold in Navajo III: "Nor do they even establish the 'limited trust relationship' existing under the [General Allotment Act]; no provision of the IMLA [of 1938] or its regulations contains any trust language." 537 U.S. at 508. Justice Ginsburg emphasized that this lack of trust language set Navajo III apart from Apache. Apache, 537 U.S. at 479-81 (Ginsburg, J., concurring) (comparing existence of trust language in Apache statute with absence of such in Navajo III statute and regulations).

Where the IMLA of 1938 and its regulations failed, however, the network of other statutes and regulations asserted by the Nation succeeds. The coal that is the subject of Lease 8580 and its amendments sits on the Nation's "reservation lands, which are held for it in trust by the United States." Navajo III, 537 U.S. at 495. The Treaty of 1868 established the Navajo reservation, setting a territory "apart for the use and occupation of the Navajo tribe of Indians." 15 Stat. 667 at art. II, XIII. The Executive Order of 1884 added lands from Arizona and Utah to the Navajo "reservation for Indian purposes." The Act of 1934 confirmed the "exterior boundaries of the Navajo Indian Reservation, in Arizona," stating that the lands were to be "permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo." 48 Stat. 960 § 1. The Act of 1934 also

authorized the Secretary of the Interior "to accept relinquishments and reconveyance to the United States of such privately owned lands," which would "be held in trust for the Navajo Tribe of Indians." Id. § 2. The Act of December 22, 1974 ("Act of 1974"), 88 Stat. 1712, 25 U.S.C. §§ 640d to 640d-31, confirmed that the lands described in the Act of 1934 "shall be held in trust by the United States exclusively for the Navajo Tribe and as a part of the Navajo Reservation." 25 U.S.C. § 640d-9. Because "[m]inerals and standing timber are constituent elements of the land itself," United States v. Shoshone Tribe of Indians of Wind River Reservation, 304 U.S. 111, 116 (1938), and because there is no language severing coal from the land held in trust, the language stating that the government holds lands in trust for the Nation applies equally to the Nation's coal located on that land.

Therefore, the substantive sources of law cited by the Nation contain explicit trust language. Because such language is necessary but not sufficient for an Indian Tucker Act breach of trust claim, we proceed to evaluate whether the network of statutes and regulations asserted by the Nation establishes specific fiduciary or other duties that can fairly be interpreted as mandating compensation for damages sustained. Navajo III, 537 U.S. at 506.

### 2. *Control of Coal Resource Planning*

The government assumed coal resource planning responsibilities in the Navajo-Hopi Rehabilitation Act of 1950.[3] Specifically, the Act authorized and directed the

---

[3] As the government asserts, it is true that the regulations promulgated in 2001 pursuant to the Navajo-Hopi Rehabilitation Act do not apply to mineral leases. 25 C.F.R. § 162.103 (2006) ("These regulations do not apply to . . . mineral leases."). This limit speaks, however, only to the scope of the regulations, not the Act. Therefore, the Act may contribute to the Nation's asserted network.

government to embark on "a program of basic improvements for the conservation and development of the resources of the Navajo and Hopi Indians, . . . and the supplying of means to be used in their rehabilitation." 25 U.S.C. § 631. The Act thus appropriated $500,000 and "funds from time to time appropriated pursuant to this subchapter" for "[s]urveys and studies of timber, coal, mineral, and other physical and human resources" and mandated that the Nation "be kept informed and afforded opportunity to consider from their inception plans pertaining to the program authorized." Id. §§ 631, 638 (emphasis added). In the context of the Act, it is clear that the government conducted such surveys and studies of the Nation's coal resources for the purpose of developing the coal economically.

### 3. Control of Coal Mining Operations

The regulations promulgated pursuant to the Surface Mining Control and Reclamation Act of 1977 also establish that the government assumed comprehensive control of coal mining operations. In 1977, the Department of the Interior promulgated what would become 25 C.F.R. Part 216 Subpart B (1987).[4] These regulations established detailed "performance standards . . . to each coal mining operation on Indian lands on or after December 16, 1977," including specifying requirements for signs and markers, postmining use of land, backfilling and grading, waste disposal,

---

[4]  As discussed in supra Part III.C, Navajo IV forecloses this panel from considering Subpart A of 25 C.F.R. Part 216 as part of the Tribe's network. Subpart B, however, was promulgated pursuant to the Surface Mining Control and Reclamation Act of 1977, not the IMLA of 1938. Compare 34 Fed. Reg. 813 (Jan. 18, 1969) (codified as amended at 25 C.F.R. Part 216 Subpart A) with 42 Fed. Reg. 63,395 (Dec. 16, 1977) (codified as amended at 25 C.F.R. Part 216 Subpart B). Therefore, this court considers the regulations of Subpart B as properly asserted by the Nation.

topsoil handling, protection of hydrologic systems, revegetation, and steep-slope mining. Id. §§ 216.103 to 216.111.

Similarly in 1984, the Department of the Interior promulgated what would become 30 C.F.R. Part 750 (1987). These regulations established numerous surface coal mining operations responsibilities for the Office of Surface Mining, the Bureau of Land Management, the Minerals Management Service, and the Bureau of Indian Affairs. The responsibilities included approving and disapproving permits, inspection and enforcement, protecting non-coal resources, approving and disapproving coal exploration and mining plans, administering mining leases, collecting and accounting for royalties, and furnishing copies of notices and orders to mineral owners. 30 C.F.R. §§ 750.6, 750.18 (1987). In addition, the regulations specifically make the Bureau of Indian Affairs responsible for "providing representation for Indian mineral owners and other Indian land owners in matters relating to surface coal mining and reclamation operations on Indian lands." Id. § 750.6(d).

### 4. *Control of the Management and Collection of Coal Mining Royalties*

In addition, the government assumed comprehensive control of the management and collection of royalties from coal mining. Section 303 of the Federal Oil and Gas Royalty Management Act of 1983 directed the Secretary of the Interior to

> study the question of the adequacy of royalty management for coal, uranium and other energy and nonenergy minerals on Federal and Indian lands. The study shall include proposed legislation if the Secretary determines that such legislation is necessary to ensure prompt and proper collection of revenues owed to the United States, the States and Indian tribes or Indian allottees from the sale, lease or other disposal of such minerals.

Concluding that the existing auditing systems "should be extended to cover solid minerals royalty management in addition to oil and gas" and that new legislation was not required to do so, 51 Fed. Reg. 15,764 (Apr. 28, 1986), the Department of the Interior promulgated regulations for solid minerals such as coal, requiring the maintenance and access to records, the accounting and auditing of royalties, and the collection of royalties. See 30 C.F.R. Parts 212, 216, 218 (1987).

Also pursuant to the Federal Oil and Gas Royalty Management Act of 1983, the Department of the Interior promulgated 30 C.F.R. Part 206 Subpart F (1989), which "prescribes the procedures to establish the value, for royalty purposes, of all coal from Federal and Indian Tribal and allotted leases." 30 C.F.R. § 206.250(a) (1989). "These rules largely continue past practice for coal valuation," 54 Fed. Reg. 1492 (Jan. 13, 1989) (stating purpose and background in final rule); adopt "valuation methods [that] would yield a reasonable and long-term maximum rate of return for both Federal and Indian leases," 52 Fed. Reg. 1840 (Jan. 15, 1987) (stating purpose and background of proposed rulemaking notice); and "are intended to ensure that the trust responsibilities of the United States with respect to the administration of Indian coal leases are discharged in accordance with the requirements of the governing mineral leasing laws, treaties, and lease terms," 30 C.F.R. § 206.250(d).

Citing Navajo III, 537 U.S. at 508 n.12, the government emphasizes that 30 C.F.R. Part 206 Subpart F "was not promulgated until 1989, after the events at issue in this case," and as such, "until 1989 the regulation was just that -- a practice -- and therefore irrelevant to Tucker Act jurisdiction." U.S. Br. 42-43. While it is true that the regulation was adopted "after the events at issue," Navajo III, 537 U.S. at 508 n.12, the

government does not dispute that the asserted sections of 30 C.F.R. Part 206 Subpart F describe actual practices that existed at the time of the lease amendments and that such practices are within the Department of the Interior's authority. Where the government exercises actual control within its authority, neither Congress nor the agency needs to codify such actual control for a fiduciary trust relationship that is enforceable by money damages to arise. See Apache, 537 U.S. at 475 (finding "a fair inference that an obligation to preserve the property improvements was incumbent on the United States as trustee" where government exercised its discretionary authority to supervise and occupy property); see also Mitchell II, 463 U.S. at 225 ("[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise).").  Therefore, the practices described by 30 C.F.R. Part 206 Subpart F are relevant and support a finding that the government had comprehensive control of the management and collection of royalties from coal mining.

### 5. Control of Coal Leasing and Liabilities Arising Thereunder

We note that specific control of coal leasing is not a prerequisite for a breach of trust claim in this case. As discussed in supra, Part III.D.2-4, the language of the statutes and regulations of the Nation's asserted network demonstrates that the government exercises comprehensive control over coal resource planning, coal mining operations, and coal royalty management and collection. As Mitchell II held regarding the harvesting and management of timber, 463 U.S. at 222, virtually every aspect of the coal located on the Nation's lands is under the federal government's control. It can

fairly be interpreted from the government's comprehensive control of the Nation's coal that the Nation's asserted network establishes a breach of trust claim under the Indian Tucker Act.

The government nonetheless argues that the asserted network must establish control or supervision over coal leasing. It is true that the Supreme Court stated that "the IMLA [of 1938] and its regulations do not assign to the Secretary managerial control over coal leasing." Navajo III, 537 U.S. at 508. The government, however, cites no authority for the proposition that control over the greater (e.g., coal resources) does not imply control over the lesser (e.g., leasing of such coal) in the Indian Tucker Act context. Indeed, the Court stated in Mitchell II, 463 U.S. at 225 (quotation marks and citation omitted), that where "the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise)." Accord Apache, 537 U.S. at 475 (finding that control over property implied "obligation to preserve the property improvements"). In this case, the government exercised blanket control over the Nation's coal resources, which could not be developed without the clear and positive approval of the Secretary. The government's argument that specific control of coal leasing is required for a money-mandating breach of trust claim is thus unpersuasive.

Even if it carried weight, that argument is flawed as applied to this case. The Indian lands section, 30 U.S.C. § 1300, of the Surface Mining Control and Reclamation Act of 1977 controls the content of coal leases. Subsections (c) and (d) direct the Secretary to incorporate interim and permanent environmental protection standards for "all existing and new leases issued for coal on Indian lands." Subsection (f) also states

that "[a]ny change required" by these subsections "in the terms and conditions of any coal lease on Indian lands existing on August 3, 1977, shall require the approval of the Secretary." The subsequently promulgated regulation accordingly amends all leases of coal on Indian lands to comply with the Surface Mining Control and Reclamation Act of 1977 "and all regulations promulgated thereunder, including those codified at 30 C.F.R. Part 750." 30 C.F.R. § 750.20(a) (1987). The government thus exercises actual control over the terms and conditions of coal mining leases, including those already in existence.

Further, the Navajo-Hopi Rehabilitation Act of 1950 contemplates government liability for leases of Indian lands requiring approval of the Secretary. Section 635(a) of Title 25 states:

> Any <u>restricted Indian lands</u> owned by the Navajo Tribe, members thereof, or associations of such members, . . . <u>may be leased by the Indian owners, with the approval of the Secretary</u> of the Interior, for public, religious, educational, recreational, or business purposes, including the <u>development or utilization of natural resources</u> in connection with operations under such leases.

25 U.S.C. § 635(a) (emphasis added). Subsection (a) makes no mention of government liability. In contrast, subsection (b) differentiates the respective responsibilities by stating explicitly that "<u>land owned in fee simple</u> by the Navajo Tribe <u>may be leased</u>, sold, or otherwise disposed of <u>by the sole authority of the Navajo</u> Tribal Council, . . . and such disposition shall create <u>no liability on the part of the United States</u>." <u>Id.</u> § 635(b) (emphasis added). Similarly, subsection (c) states:

> The <u>Secretary</u> of the Interior is <u>authorized to transfer, upon request of the Navajo</u> Tribal Council, . . . legal title to or <u>a leasehold interest in any unallotted lands</u> held for the Navajo Indian Tribe, and thereafter the <u>United States shall have no responsibility or liability</u>

for, but on request of the tribe shall render advice and assistance in, the management, use, or disposition of such lands.

Id. § 635(c) (emphasis added). The Nation thus asserts that "by expressly exempting the United States from liability for similar transactions under subsections 635(b) and (c)," it is a "fair inference" that the United States "intended to shoulder liability and responsibility" for leases of Indian lands under subsection (a) dealing with "the development or utilization of natural resources" and requiring approval of the Secretary. Nation Br. 47. The government does not dispute the Nation's interpretation, and we agree that government liability from the approval of such leases is a "fair interpretation."

The Nation's asserted network thus demonstrates that the government controls the leasing of the Nation's coal resources and that the government is responsible for the liabilities arising thereunder.

### E. Purposes of Asserted Network

Interpreting the asserted network to mandate a right of recovery in damages against the government in this case is consistent with the purposes of the statutes and regulations. First, the government entered into the Treaty of 1849 "to secure the permanent prosperity and happiness of said Indians." 9 Stat. 974 at art. I, XI. Second, the Navajo-Hopi Rehabilitation Act of 1950 authorized and directed the Secretary of the Interior to undertake "a program of basic improvements for the conservation and development of the resources of the Navajo and Hopi Indians"

> to further the purposes of existing treaties with the Navajo Indians, to provide facilities, employment, and services essential in combating hunger, disease, poverty, and demoralization among the members of the Navajo and Hopi Tribes, to make available the resources of their reservations for use in promoting a self-supporting economy and self-reliant communities, and to lay a stable foundation on which these Indians can engage in diversified

> economic activities and ultimately attain standards of living comparable with those enjoyed by other citizens.

25 U.S.C. § 631. Third, the regulations promulgated pursuant to the Federal Oil and Gas Royalty Management Act of 1983 recognize that the actual practices of the Department of Interior, at the time of the lease amendments in this case, used methods to "yield a reasonable and long-term maximum rate of return for both Federal and Indian leases" and "intended to ensure that the trust responsibilities of the United States with respect to the administration of Indian coal leases are discharged in accordance with the requirements of the governing mineral leasing laws, treaties, and lease terms." 52 Fed. Reg. 1840 (Jan. 15, 1987) (stating purpose and background of proposed rulemaking notice); 30 C.F.R. § 206.250(d) (1989). Therefore, the purposes of the asserted network of statutes and regulations support finding a fiduciary relationship between the government and the Nation that is money-mandating under the Indian Tucker Act.

The government appears to rely on the statement in Navajo III, 537 U.S. at 508, that the IMLA of 1938 "aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties." While "we cannot ignore the tension between IMLA's two objectives," Navajo III, 537 U.S. at 517 (Souter, J., dissenting), this court would err through overbroad application of the Navajo III holding. The Court in Navajo III interpreted the government's duties based only on the IMLA of 1938 and its regulations, IMDA of 1982, and 25 U.S.C. § 399. None of these three statutes are part of the asserted network of statutes and regulations discussed in supra, Part III.D, that forms the basis of the Nation's money-mandating claim in this appeal.

2006-5059                                                31

## F. Scope and Breach of Government's Trust Duties

Even with a substantive source of law that can fairly be interpreted as mandating compensation for a breach of trust, the government asserts that the breach alleged by the Nation does not fall within the scope of the government's fiduciary trust duties. Specifically, the government asserts that the Nation must allege a violation of a specific rights-creating or duty-imposing statute or regulation and that the common law of trusts cannot be applied. These arguments fail for two independent reasons. In addition, the undisputed facts as determined by the Court of Federal Claims demonstrate that the government breached its trust duties. This court thus holds that the Nation is entitled to judgment as a matter of law. SmithKline, 403 F.3d at 1337 (stating that if "both parties sought summary judgment" and if "this court determines that no material facts remain in dispute, [this court] may proceed to determine entitlement to judgment under the law").

First, the Supreme Court heard, considered, and rejected these arguments by the government in Apache. See Apache U.S. Br., 2002 WL 1559747, at *35-43. It is true that in determining whether there is a "claim cognizable under the Indian Tucker Act," "the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." Navajo III, 537 U.S. at 506. "But once that focus [for the trust relationship i]s provided, general trust law [i]s considered in drawing the inference that Congress intended damages to remedy a breach of obligation." Apache, 537 U.S. at 477. The Court thus found in Apache that common-law trust duties helped to define the "contours of the United States' fiduciary responsibilities." See id. 474-75.

> While it is true that the 1960 Act does not, like the statutes cited in that case, expressly subject the Government to duties of management and conservation, the fact that the property occupied by the United States is expressly subject to a trust supports a fair

2006-5059                                          32

inference that an obligation to preserve the property improvements was incumbent on the United States as trustee. This is so because elementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch.

Id. at 475. Likewise, in Mitchell II, the Court stated that "a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians." 463 U.S. at 225 (noting that "[a]ll of the necessary elements of a common-law trust are present" even though "'nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection'" (quoting Navajo Tribe of Indians v. United States, 224 Ct. Cl. 171, 183 (1980))). In this case, the government's arguments are identical to those it made in Apache. Therefore, this court rejects the government's arguments and holds that the common law trust duties of care, candor, and loyalty help define the fiduciary responsibilities in this case. In Navajo I, the Court of Federal Claims found that the government violated these basic duties of care, loyalty, and candor owed a beneficiary by a trustee. See 46 Fed. Cl. at 226-27 ("Let there be no mistake. Notwithstanding the formal outcome of this decision, we find that the Secretary has indeed breached these basic fiduciary duties."). We agree that the government violated these common-law trust duties.

Second, the asserted network of statutes and regulations enumerates specific duties that the government violated. The Navajo-Hopi Rehabilitation Act of 1950 provides that the "Tribal Councils of the Navajo and Hopi Tribes and the Indian communities affected shall be kept informed and afforded opportunity to consider from their inception plans pertaining to the program authorized," including the "program of

basic improvements for the conservation and development of the resources of the Navajo and Hopi Indians." 25 U.S.C. §§ 631, 638. Similarly, 30 C.F.R. § 750.6(d) (1987), promulgated pursuant to the Surface Mining Control and Reclamation Act of 1977, specifically makes the Bureau of Indian Affairs responsible for "providing representation for Indian mineral owners and other Indian land owners in matters relating to surface coal mining and reclamation operations on Indian lands." In this case, the Court of Federal Claims found that the government met "secretly with parties having interests adverse to those of the [Nation], adopt[ed] the third parties' desired course of action in lieu of action favorable to the [Nation], and then misle[d] the [Nation] concerning these events." Navajo I, 46 Fed. Cl. at 226. Under these facts, the government violated its duty to keep the Nation informed regarding the development of its coal resources and to provide the Nation representation in a matter related to coal mining operations.

In addition, the Indian lands section of the Surface Mining Control and Reclamation Act of 1977 mandates that the Secretary "shall include and enforce terms and conditions . . . as may be requested by the Indian tribe in such leases." 30 U.S.C. § 1300(e); see also 30 C.F.R. 750.20 (1987) (using nearly identical language). This language indicates Congress' apparent desire that terms and conditions requested by the Nation be included in leases. Cf. Agwiak v. United States, 347 F.3d 1375, 1380 (Fed. Cir. 2003) ("We have repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating."). The Nation has cited legislative history to support this interpretation: "This is Indian land. There is a section in this bill that deals specifically with how the Indians will be protected, and so forth, as they negotiate."

123 Cong. Rec. S15,575 (daily ed. May 19, 1977) (statement of Sen. Goldwater). In this case, the Nation's request was reasonable. The Nation did not ask the Secretary to incorporate an outrageous term or condition. Rather, the Nation asked that the royalty rate be adjusted to a reasonable level, and Peabody had consented to such a reasonable adjustment explicitly in Lease 8580. Prior to the ex parte interference, the Bureau of Indian Affairs had deemed proper and approved an increase in the royalty rate to 20%. Despite the mandate of § 1300(e) and the Nation's request for an adjustment to a reasonable royalty rate, however, it is undisputed that Secretary Hodel refused to make this royalty adjustment permanent after meeting with Peabody's representative, whom the government conceded was "a former aide and friend of Secretary Hodel." The Nation thus entered negotiations with Peabody "unarmed with critical knowledge" and unaware "that it no longer had [a] competitive edge in its bargaining while the companies were well aware of the fact." Navajo I, 46 Fed. Cl. at 227. "Then after very briefly reviewing the merits of the proposals, the Secretary approved lease amendments with royalty rates well below the rate that had previously been determined appropriate by those agencies responsible for monitoring the federal government's relations with Native Americans." Id. at 226-27. Under these facts, the government violated its duty to include and enforce terms and conditions requested by the Nation.

Similarly, in Escondido Mutual Water Co. v. La Jolla Band of Mission Indians, 466 U.S. 765 (1984), the Supreme Court held that requested terms must be incorporated where mandated by a statute. The statute at issue in Escondido placed a specific condition on the power of the Federal Energy Regulatory Commission

("Commission") to issue licenses for "hydroelectric project works located on the public lands and reservations of the United States, including lands held in trust for Indians." <u>Id.</u> at 767. Specifically, § 4(e) of the Federal Power Act, 41 Stat. 1066 (codified as amended at 16 U.S.C. § 797(e)), stated that the licenses "<u>shall be subject to and contain such conditions</u> as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservations" (emphasis added). Based on this statutory language, the Court stated that "Congress' apparent desire that the Secretary's conditions 'shall' be included in the license must therefore be given effect unless there are clear expressions of legislative intent to the contrary." <u>Id.</u> at 772. Finding that Congress "was no doubt interested in centralizing federal licensing authority into one agency" and that "it did not intend to relieve the secretaries of all responsibility for ensuring that reservations under their respective supervision were adequately protected," the Court concluded that there was no clear legislative intent to the contrary. <u>See</u> <u>id.</u> at 773-75. In addition, the Court was untroubled by the ability of the Secretary to require "the Commission to include the Secretary's conditions in the license over its objection" because the statute limited the types of conditions that the Secretary could require to those "reasonably related to the protection of the reservation and its people." <u>See</u> <u>id.</u> at 776-79.

The government appears to assert that the Secretary's duty to include and enforce terms and conditions requested by the Nation under § 1300(e) is limited to environmental protection standards. It is true that the Surface Mining Control and Reclamation Act of 1977 focuses on environmental protection, not royalty rates. Neither § 1300(e) nor its companion regulation, however, contains any subject matter limitation.

The government also asserts that § 1300(e) does not apply because Lease 8580 did not issue after August 3, 1977. The government, however, fails to note the lease amendments, which the parties executed and the Secretary approved after August 3, 1977. While § 1300(e) and its companion regulation do not specify whether the statutory requirement should apply to the lease amendments in this case, this court concludes in the affirmative. The lease amendments to Lease 8580 did not incorporate a minor change. Rather, the package of amendments adjusted the royalty rates for three different leases, resolved a broad range of issues between Peabody and the Nation, and added 90 million tons of coal to the 200 million tons originally leased from the Nation's reservation lands in Arizona. Without its exhibits, the amendments numbered more pages than the original Lease 8580. Therefore, while an amendment in form, the agreement was in substance a new lease. Indeed, within the agreement, the parties acknowledged that the parties could have executed a separate lease or leases to address the same issues, and that they chose to do so instead in a document that amended Lease 8580. Under these circumstances, this court holds that § 1300(e) applied to the lease amendments at issue in this case and thus, imposed a duty on the Secretary to include and enforce a reasonable royalty rate.

## IV.

For the foregoing reasons, we conclude that the network of statutes and regulations asserted by the Nation identify substantive sources of law that establish specific trust duties and can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties imposed by the governing law. In addition, we conclude that the Nation has alleged and, based on the undisputed

factual findings of the Court of Federal Claims in <u>Navajo I</u>, has demonstrated that the government violated its common law trust duties of care, candor, and loyalty; its duty under the Navajo-Hopi Rehabilitation Act of 1950 to keep the Nation informed regarding the development of its coal resources; its duty under the regulations promulgated pursuant to the Surface Mining Control and Reclamation Act of 1977 to provide the Nation representation in a matter related to coal mining operations; and its duty under the Indian Lands section of the Surface Mining Control and Reclamation Act of 1977 to include and enforce terms and conditions requested by the Nation.

Accordingly, this court holds that the Nation has a cognizable money-mandating claim against the United States for the alleged breaches of trust and that the government breached its trust duties.  We reverse the order of the Court of Federal Claims and remand for further proceedings consistent with this opinion.

<u>REVERSED and REMANDED</u>

Each party shall bear its own costs for this appeal.